**LYNCH LAW FIRM, P.C.**
Paul I. Perkins, Esq.
paulperkins@lynchlawyers.com
45 Eisenhower Drive, 3d Floor
Paramus, NJ 07652
Tel: (800) 656-9529
Fax:(888) 271-9726

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
Peter S. Pearlman, Esq.
psp@njlawfirm.com
Park 80 Plaza West – One
Saddle Brook, NJ 07650
Tel: (201) 845-9600
Fax: (201) 845-9423
*Attorneys for the Plaintiff and the Class*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**NEWARK VICINAGE**

| | |
|---|---|
| AL KOWALSKI d/b/a KOWALSKI PLUMBING, and MICHELLE WINICK d/b/a MICHELLE WINICK DESIGN, MICHAEL GIDRO, individually, and on behalf of all others similarly situated, | **CIVIL ACTION**<br>**No. 09-2382 (PGS) – (ES)** |
| Plaintiffs, | |
| -vs- | **FIRST AMENDED COMPLAINT** |
| YELLOWPAGES.COM, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Al Kowalski d/b/a Kowalski Plumbing ("Kowalski") maintaining his principal place of business at 71 Central Avenue, Rochelle Park, NJ 07662 and Michelle Winick d/b/a Michelle Winick Design ("Winick") maintaining her principal place of business at 96 Main Street, Little Falls, NJ 07424 and Michael Gidro ("Gidro") d/b/a Law Offices of Michael Gidro maintaining his principal place of business at 1420 Queen Anne Road, Teaneck, NJ 07666 (collectively "Plaintiffs"), individually, and on behalf of themselves, and all others similarly situated, by and through counsel, complain of the defendant, Yellowpages.com, LLC ("Defendant") as follows.

## I. SUMMARY OF COMPLAINT

1.      This is a class action lawsuit against Yellowpages.com arising out of its deceptive and fraudulent business practices inflicted upon the Plaintiffs and a class ("the Class") consisting of all persons or entities in the State of New Jersey that allegedly contracted with Defendant for advertising services from and after May 1, 2005.  The members of the Class are referred to as the "Class Members."

2.      According to Defendant's website, it operates an online advertising service and is a:

> . . . wholly owned subsidiary of AT&T. . . . [Yellowpages.com] is uniquely able to offer searchable directory listings. . . . . [Yellowpages.com is an] online source for comprehensive national and local business information. The [Yellowpages.com] distribution network provides exposure to more than 100 million monthly consumer business searches. Consumers can locate merchants, search White Pages directories, research products and services, obtain maps and directions, and plan entertainment, leisure and travel activities.

Available at www.yellowpages.com/about; last visited October 29, 2009.

3.     Defendant is in the business of soliciting advertising from individual and business consumers and displaying that advertising on the internet for the general public to search and providing services to its customers, including the Class Members by driving internet traffic to their Yellowpages.com ad and/or website. Among other things, Yellowpages.com follows the same format as the Yellow Pages telephone directories that are distributed throughout the United States, except that the advertising appears on the internet. Yellowpages.com can be searched by a member of the general public on a nationwide or geographic specific basis.

4.     Class Members are solicited by Defendant in two basic modes:  in person by a salesperson who comes to the Class Member's residence or business ("Premise Sales"); or, on the phone by a telephone solicitor on behalf of Yellowpages.com ("Telephone Sales").

5.     Notwithstanding the method of solicitation, the prospective Class Members are subjected to the same misrepresentations, omissions and deceptive methods of sale. The approach uniformly utilized by the Defendant's Salespeople (the "Salesperson" or "Salespeople") is contained in a scripted sales presentation (the "Scripted Presentation"). As the misconduct alleged is the same regardless of, and the facts are unaffected by, the mode of solicitation, this Complaint, in general, does not distinguish between Premise Sales and Telephone Sales.

6.     Defendant's Salespeople offer two types of services:

i.     Defendant represents that it provides the number one online yellow pages search engine and thus, any Class Member who purchases a listing within the Yellowpages.com site automatically receives a high amount of exposure. Moreover, the Salespeople represent that Yellowpages.com has developed

"partnerships" with major online search engines like Google.com, Yahoo.com, MSN.com, and others and, as a result, Class Members will be featured prominently in the results of searches run on those search engines. Defendant's Salespeople represent further that because of the "partnerships," it is cheaper to advertise with Yellowpages.com than directly with those major search engines.

ii. Yellowpages.com also features several types of advertising products in which the Class Members can also enroll, including, but not limited to:

a. The YPClicks! Program or Yellowpages.com Guaranteed Clicks Program. This is a program wherein Class Members are guaranteed to receive a certain number of Clicks[1] on their Yellowpages.com ad or website during a specific period of time. For example, a Class Member might sign up for 1200 Clicks over the period of a year.

b. The Click to Call Program. This is a program wherein the Class Member is charged a fee only when someone calls from a special phone number listed on the Class Member's ad. Like the YPClicks! Program, the Class Member is guaranteed a certain number of calls within a specific time period.

c. The Purchase of a Tile Position. This program assures the Class Member his or her ad will be featured in a box advertisement (a

---

[1] A "Click" is when a member of the general public, searching the internet, Clicks on a link or logo that takes that person to a specific site on the internet. In this case, the logo or link takes the person to the Class Member's Yellowpages.com ad or website.

"Tile") at the top of list of results displayed when a member of the public searches the Yellowpages.com site only for goods and services in the Class Members' designated geographic area.

7.    In selling these programs to the Class Members, Yellowpages.com engages in misleading, fraudulent and unconscionable business practices, including, but not limited to the following:

    i.    The Salespeople state that by advertising in Yellowpages.com the Class Member will benefit from featured prominence in major online search engines. As discussed below, the Class Members' ads are not featured as represented by the Salespeople and Defendant has no reasonable basis to believe they will be.

    ii.    The Class Members are not provided with the Terms and Conditions of the sales contract until after they have either signed an order form or recorded their oral assent to purchase over the phone. Yellowpages.com uses this alleged assent to assert that the Class Member is bound to a contract (the "Alleged Assent") even though the Terms and Conditions subsequently disclosed to Class Members differ materially from what they are shown and/or told.

8.    As part of the Yellowpages.com sales training, all Salespeople must memorize the Scripted Presentation and employ a particular methodology when selling Yellowpages.com products. The Scripted Presentation and other methods utilized by the Salespeople are inherently misleading, fraudulent and deceptive; consequently, upon conclusion of the Salesperson's presentation, Class Members believe they are going to receive particular benefits

on certain terms when there is no reasonable basis for the Salesperson to assert that the benefits will be achieved and the terms are materially different than what is represented. In fact, both the outcome and terms differ materially from what is represented. A Class Member who realizes s/he is not getting the services represented by the Salesperson is unable to cancel the contract with Yellowpages.com. When the Salesperson and manager are unable to deflect a Class Member's complaints and the Class Member declines to pay, s/he is subjected to an aggressive collections process to enforce payment.  The common mantra of the collections department is that everyone must pay (sooner rather than later) or their credit will be damaged. Utilizing this approach, Yellowpages.com has experienced significant growth in the last three (3) years.

## II. JURISDICTION AND VENUE

9.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(d) (the Class Action Fairness Act).

10.    This Court has jurisdiction over Defendant because Defendant conducts a significant amount of business in and with the citizens of the State of New Jersey.

11.    Venue is proper in this Court because at all times relevant, the practices complained of herein were directed to and/or occurred in this judicial district and because Defendants have received substantial compensation as a result thereof in this district.

### III. BACKGROUND AND NATURE OF THE DECEPTIVE PRACTICE

**Brief History and Rapid Growth of Yellowpages.com**

12.     In November of 2004, SBC and BellSouth entered into a partnership to create a joint venture, to acquire the online directory publisher then known as www.Yellowpages.com, Inc. SBC and BellSouth then combined the SBC site, the Bellsouth directory site and the Yellowpages.com site that was purchased to create the present Yellowpages.com website.

13.     In April of 2005, Defendant announced a program wherein consumers would be guaranteed a certain number of Clicks to their website or ad for a given period of time: "[t]he new search engine product eliminates the need for businesses to learn and navigate multiple search engines, search methods and submission standards to advertise strategically on the Internet. It also reduces risk by enabling advertisers to purchase a specified number of Clicks for a flat fee."[2]  At the time of this announcement, Defendant was offering two services to the public: 1) a listing service on Yellowpages.com; and, 2) "strategic" listings within search engines on the internet.

14.     In early 2006, Defendant assembled a team of sales professionals from the telecom industry and crafted the Scripted Presentation.

15.     The first city in which this Scripted Presentation was tested was Philadelphia, Pennsylvania. It proved to be quite successful in generating revenue.  In late Summer of 2006, the sales team was split and sent to New York and Baltimore in order to capitalize on the success experienced in Philadelphia.

---

[2]   Press Release, dated April 28, 2005, available at http://www.att.com/gen/press-room?pid=4800&cdvn=news&newsarticleid=21656, last visited October 29, 2009.

16.     In December of 2006, AT&T and BellSouth were merged to create the present AT&T. As part of this process, Defendant became a wholly owned subsidiary of AT&T.

17.     The model that had been conceived in Philadelphia also proved successful in securing business in New York and Baltimore, and a training center was set up just outside Philadelphia to train the Yellowpages.com salespeople in the Scripted Presentation.

**Training the Salespeople**

18.     The Salespeople are highly trained and are indoctrinated by the Yellowpages.com sales trainers to hard-sell Yellowpages.com products.

19.     The Salespeople attend sales training facilities where they receive a two week intensive ad sales course.   Salespeople are scrutinized on every aspect of the Sales Presentation. They are evaluated as to: 1) the approach taken with the prospective Class Member (the customer); 2) the  ability to do discovery and fact-finding with the prospective Class Member; 3) the   actual presentation and recommendation; 4) how the Salesperson performed in closing the deal; and 5) how the Salesperson handles Class Member objections. The extensive training ensures the Salespeople do not deviate from the Scripted Presentation.

20.     Every Salesperson must memorize the Scripted Presentation in order to receive a sales position with Yellowpages.com. They are given additional tools to sell the Yellowpages.com advertising products in the form of anecdotes, stories and mottos.

21.     When the Salesperson completes the required training s/he returns to the local office to begin selling ads.

22.     The Salespeople earn their commissions upon what Yellowpages.com determines to be the consummation of the sale to the Class Member. The commission is not

dependent upon whether the Class Member pays for the service but rather the Salesperson's ability to close the sale. As such, the Salesperson is incentivized to do anything s/he can to close the deal and get the Class Member to sign on the proverbial dotted line.

23.    The Salespeople have sales quotas they must meet to retain their jobs.  Upon information and belief, the present attrition rate for Salespeople is over 50%.

**The Actual Sales Presentation**

24.    The sales presentation is governed by the Scripted Presentation.

25.    The Scripted Presentation includes the following:

i.    Initially, the Salesperson greets the customer and states:

"Good Morning, [Class Member]. I want to thank you for taking the time to meet with me today . . . when we spoke on the phone you indicated that you were looking to grow your business and that <u>guaranteed</u> traffic to your website could benefit you and help  you to meet your business goals."

(Emphasis added) (the language regarding an actual meeting is modified for a telephone sale). Thus, the theme that Yellowpages.com offers guarantees in conjunctions with its advertising products is introduced at the inception.

ii.  Next, the Salesperson states: "I have worked with many others [people in Class Member's business plumbers, interior designers, lawyers, etc.] in the past, and have helped them to meet their business goals." The Salesperson is told to say this whether or not s/he has had any experience selling Yellowpages.com products to individuals or entities within the Class Member's particular line of business.

iii. The Salesperson then asks questions about the Class Member's business – Defendant calls this the Needs Assessment Analysis (the "Needs Assessment." The questions include:

    a. "How did you get involved in [Class Member's] business?";

    b. "How long have you been in business?";

    c. "Your ad says [What Class Member's ad says] . . .";

    d. "Which side [of Class Member's Business is the Class Member] looking to grow?";

    e. "What other type of work do you do?";

    f. "What is the average job worth?" (This is meant to elicit the gross revenue per job performed by the Class Member);

    g. "How much work do you do in a week?";

    h. "How much more work could you do in a week?";

    i. "How far will you travel?" – or "Where do you pull your clients from?";

    j. "If 10 people locally searching online for [Class Member's Business] saw your website [or ad], how many do you think would do business with you?"

iv. This Needs Analysis is later utilized by the Salesperson to sell the Yellowpages.com products. At this point, the Salesperson confirms to the Class Member all of the information the Class Member has told him/her.

v. The Class Member is then told "[Yellowpages.com has] partnerships with most of the major search engines such as Google, Yahoo, Dogpile and many

more . . . . We offer services to build traffic to your website on both searches." The phrase "both searches" refers to the searches generated by the general public on the major search engines like Yahoo or Google and the searches performed on Yellowpages.com website.

vi. The Salesperson then represents: "Yellowpages.com is the #1 online yellow pages in the Country. We connect buyers with sellers by [enabling members of the general public to search] a specific category in a geographic area."

vii. The Salesperson then shows the Class Member a spreadsheet that is represented to show how many searches there were on Yellowpages.com for the Class Member's products or services in the Class Member's geographic area. This data is generated from an internal system at Yellowpages.com called Samurai. However, that representation is false and the data is inherently misleading because Samurai derives its data not from Yellowpages.com alone, but also includes searches conducted on major online search engines like Google and Yahoo. Thus, the amount of traffic which is represented to come from the Yellowpages.com website is materially overstated.

viii. The Salesperson uses this data to convince the Class Member that by purchasing a prominent position or a position at the top of the Yellowpages.com heading the Class Member will receive significant exposure.

ix. The Salesperson then attempts to sell a guaranteed Clicks package to the Class Member, "[w]e offer a guaranteed number of Clicks to your website

per month on Google, Yahoo, Dogpile and many other search engines . . . ." As discussed above, the YPClicks! or Yellowpages.com Guaranteed Clicks states that the Class Member will receive a guaranteed number of Clicks on his or her ad or website within a specific period of time (usually a year). Yellowpages.com has a corollary program called the "Guaranteed Click to Call Program" wherein a Class Member is guaranteed a certain number of phone calls and only pays for the calls that the Class Member receives. The Salesperson uses the same Scripted Presentation to sell the Guaranteed Click to Call Program as is used for the YPClicks! Program.

x. The Class Member is assured that Yellowpages.com can "build traffic to [the Class Member's] website when someone is searching in their local area for the services you offer." Because it is obviously so important, the idea that the Class Member will receive Clicks from "local" and "targeted" traffic is stressed over and over by the Salesperson. That concept is false, however, since, in reality, a significant number of the Clicks received do not come from the local or targeted area and there is no reason for Defendant to believe they will.

xi. The Class Member then is subjected to hard sell techniques to agree to buy one of the programs Defendant offers. The Salesperson states, "[w]hen people go to the internet looking for the services you offer, Yellowpages.com is going to make sure you are represented based on your needs. . . . we are going to make sure you are one of the Premier [Class Member's business] in [Class Member's area] . . . . We are going to place

you at the top of the [Class Member's category] heading with a Tile. . .  We are also going to make you one of the top 6 listings under each heading with a priority local listing."

xii. The Salesperson again stresses, that Clicks will be local and qualified, "When people are searching for your services on Google, Yahoo, Dogpile, Metacrawler, WebCrawler, Alta Vista and all the web, we are going to offer locally targeted, qualified traffic to your website. We are going to <u>guarantee</u> [number of Clicks] to [Class Member's website] in the next 12 months." (Emphasis added).

xiii.  If the Class Member seems unsure, the Salesperson will perform a "Return on Investment" analysis (the "ROI Analysis") as part of the Scripted Presentation.

xiv.  In the ROI Analysis, the Salesperson takes the information obtained in the Needs Analysis and utilizes it to estimate gross revenue the Class Member purportedly will derive by purchasing Yellowpages.com advertising products.

xv. The ROI Analysis is often utilized in the context of the YPClicks! or Guaranteed Clicks Program and the Guaranteed Click to Call Program and is presented in this manner: First, the number of Clicks the Salesperson is attempting to sell on an annual basis to the Class Member is divided by 12 – this gives the Class Member an average number of Clicks per month; so if a Salesperson is attempting to sell a package containing 2400 Clicks per year,

the Salesperson will tell the Class Member the average number of Clicks will be around 200 a month.

xvi.  Then the Salesperson applies what is referred to as the average Click to convert ratio to the monthly average Clicks. This ratio is based on the Scripted questions "if 10 people locally searching online for [Class Members' business or profession] saw your website, how many do you think would do business with you?" The answer given by the Class Member becomes the Click to convert ratio for that particular Class Member. In other words, if the Class Member responds that 2 people out of 10 would do business with him/her if they Clicked on his/her ad or website, the Salesperson will use a 20% Click to convert ratio. There is no legitimate basis for that ratio, however, and, indeed, even phrasing the question in that fashion is materially misleading since it presumes an average Click to convert ratio of at least one in ten when in fact the average rate is only a tiny fraction of that, and Defendant knows that to be the case.

xvii. Armed with what is already a materially false premise, the Salesperson then estimates the actual number of people that purportedly will do business with the prospective Class Member. So if the average number of Clicks per month is 200 and the Class Member supposedly can convert 20% to new business, the Salesperson  reasons the Class Member will have 40 new customers a month.

xviii. The Salesperson then multiplies the purported number of new customers by the equally unsupported gross revenue generated per job (the amount

each job purportedly "is worth"). So if the Class Member has speculated the average job, sale, or client was worth $1000, the Salesperson states, "is it fair to say that the Click package could bring you a return on investment of [$40,000] a month?"

xix.   The Salesperson then attempts to sell a Class Member a package that costs something less than the amount arrived at through the monthly ROI Analysis.

xx. This approach to sales is illusory, misleading, and deceptive. The Salesperson has constructed in the mind of the Class Member a knowingly false expectation of what the Class Member will receive in monthly revenue as a result of advertising with Yellowpages.com.

**The Yellowpages.com Products**

26.    The Salespeople represent that Yellowpages.com is the number one online yellow pages search engine and this "new search engine product <u>eliminates the need for businesses to learn and navigate multiple search engines, search methods, and submission standards to advertise strategically on the Internet</u>"[3] (emphasis added). Thus, the Class Member is told that if listed within the Yellowpages.com site, s/he automatically receives the benefit of a listing in a website that is heavily searched by the general public looking for goods and services. Moreover, the Defendant has developed "partnerships" with major online search engines like Google.com, Yahoo.com, and MSN.com, etc. and, as a result, Yellowpages.com "makes sure" that when a member of the general public is searching major internet search

---

[3] Press Release by AT&T, dated April 28, 2005, available at http://www.att.com/gen/press-room?pid=4800&cdvn=news&newsarticleid=21656; last visited October 29, 2009.

engines for goods and services similar to that of the Class Member in the Class Member's geographic area, the Class Member's ad will be featured. In addition, the Salesperson states that, as a result of the "partnerships," the Class Members actually receive lower prices for being featured in those major online searches than they would if they were to advertise directly with those search engines. The Salespeople stress that Yellowpages.com has the technology to ensure that the Class Member's ad or website will appear in local and targeted searches.

27. Yellowpages.com features several types of advertising products in which the Class Members can enroll, including, but not limited to:

        i.    The YPClicks! Program. The YPClicks! program represents that a Class Member will receive a requisite amount of "Clicks" within a period of one year. The Class Member pays for this service on a monthly basis. If the Class Member does not receive the number of Clicks for which s/he has contracted, the Salesperson tells the Class Member his or her contract will be extended until s/he receives the requisite number of Clicks. However, Defendant does not extend the contract free of charge and the Class Member must continue paying the regular monthly charge. Thus providing the class member the "benefit" of being able to pay once again for something s/he did not get the first time s/he paid for it in the hope s/he may get it the second. The Salesperson stresses that the Clicks will come from "local" and "targeted" traffic since, obviously, a Click on the website of a plumber in Cleveland, Ohio by a consumer in Phoenix, Arizona is hardly useful.

ii. <u>The Click to Call Program.</u> The premise of the Click to Call program is similar to that of the YPClicks! program. In this plan, the Class Member pays only when someone calls to a special phone number listed on the Yellowpages.com ad.  As in the YPClicks! Program, the Salesperson tells the Class Member the phone calls will come from "local" and "targeted" traffic. The contracts for this program also are computed on an annual basis with fees charged on a per call basis.  Unfortunately for the Class Member, if s/he receives a phone call, via his or her Yellowpages.com special phone number and that call has nothing to do with purchasing products or services from the Class Member or if the call is made from someone out of the Class Member's geographic area, the Class Member is still responsible for paying for that phone call.

iii. <u>The Purchase of a Tile Position</u>. This program purportedly allows the Class Member's ad to be featured at the top of the list of results displayed when a member of the public searches the Yellowpages.com site only for goods and services in the Class Members' geographic area (the top billing is referred to as a "Tile Position").

iv. <u>Bells and Whistles</u>. Although not part of the Scripted Presentation, Class Members who do not purchase Tile Positions are told uniformly that to be featured prominently on the

Yellowpages.com website, they must purchase other "bells and whistles" as they are referred to by the Salespeople.  Some of those items include:  A) displays of the Class Member's business logo; B) a package that includes links to the Class Member's website; and, C) other distinguishing items such as directions, testimonials, etc.

28.     The misleading Scripted Presentation in tandem with unconscionable and deceptive business practices in the sale and implementation of the product has earned Yellowpages.com substantial revenues at the expense of the Class Members.

## V.  THE DECEPTIVE PRACTICE EXPOSED

### The Faulty Search Engine Product and the Internet Search Engine Irrelevancy

29.     Defendant's representations that by advertising with Yellowpages.com, the Class Member will receive premium placement in the "sponsored" listings on major search engines, like Google and Yahoo is false and misleading.

30.     The Salespeople stress that Defendant's search engine product will eliminate the need for the Class Member to learn and navigate multiple search engines, search methods and submission standards to advertise strategically on the Internet. As such, the Class Member is led to believe Yellowpages.com will ensure that the Class Member's ad or website will be featured in searches performed by members of the public that are local to the Class Member and that the search within which the Class Member is found will be relevant to the Class Member's business.  The Salesperson states further that Yellowpages.com has developed "partnerships" with the major internet search engines and, as such, the Class Member will receive the opportunity to advertise with the major internet search engines, but that it is actually cheaper for the Class Member to advertise with Yellowpages.com.

31.     Most major internet search providers like Google use an "auction" process whereby a member of the public seeking to appear in searches, in the "sponsored" section or be featured prominently can actually bid on search words (i.e. "attorney," "plumber" or "interior design"). A member of the public bids on specific "ad words" by setting a price that the person is willing to pay to appear in a sponsored listing position. A sponsored listing position on Google or Yahoo appears as an ad above and/or to the right of the regular search results (also called the organic search results). They are highlighted so that the public may find them more

easily. The Internet search engine industry is a dynamic atmosphere. As such, the words upon which the public bid can vary in price and value on a daily basis.

32.     The words upon which a member of the public must bid will change on a constant basis and will need consistent attention and care to remain relevant and appear in the "sponsored" listings section on Google, Yahoo, etc. or appear in prominent places. Therefore, certain words and combinations of words will become more or less relevant (and, therefore, costly) depending on how many people are bidding on the particular words, how often those bids are being made, and how many times the general public searches for these particular ad words. As such, the value of ad words can change and alter on an almost daily if not hourly basis (for example, some words or word combinations may have little value (or relevancy) until a particular time or event like "September 11." Defendant professes that it will keep pace with this dynamic atmosphere on a constant basis and provide the Class Member a customized solution.

33.     In reality, this does not happen. Yellowpages.com lacks the requisite staff or the staff is unable to deliver on the promises made by Defendant.  Thus, the representations made by the Salespeople as to Defendant's ability to perform this part of the Agreement are false and misleading.

34.     In addition and contrary to what the Class Member is told as part of the Scripted Presentation, there is and can be no assurance the Class Member's ad:

      i.   will be featured prominently in searches (in some cases the Class Member's ad may be rotated in conjunction with other Yellowpages.com customer adds in the prominent positions, thus substantially reducing the Class Members exposure);

    ii.  will appear in the proper geographic area;

    iii. will appears in the proper category; or,

    iv. will appear in searches in the categories requested;

35.    To the extent the Class Member needs technical support (*i.e.* for the Search Engine Product) or to help with their website or ad, there is little, if any, technical support and Defendant has a practice of putting ads and websites together in a rushed and hurried manner and the Class Member is often unable to make changes, corrections or edits. In short, Defendant lacks the capacity or the will to deliver on its representations that the Class Member's ad will appear in the relevant strategic positions within major online search engines.

**The Search Engine Product – Yellowpages.com Internal Searches/Tile Positions**

36.    At the beginning of the presentation, the Salesperson shows the Class Member a spreadsheet that is represented to demonstrate the number of searches conducted by the general public on Yellowpages.com, for a particular product or service offered by the Class Member within the Class Member's geographic area on a monthly basis.

37.    In fact the number of searches on the spreadsheet does not come from Yellowpages.com alone, but from other major search engines as well. As a result, the representation that the number of searches shown on the spreadsheet is demonstrative of the results which can be expected by a Class Member advertising on Yellowpages.com is false and untrue.

38.    As such, and in conjunction with the Scripted Presentation, the Class Member is given a false expectation of the outcome that will be achieved. The Yellowpages.com Salespeople use inflated and misleading search data in order to convince the Class Member

s/he or it will receive unrealistic returns as a result of his or her investment into the advertising services of Yellowpages.com

39.    Despite Defendant's representation to the contrary, Yellowpages.com is not a major online search engine. It is not listed in the top search engines by internet analysts see, for example, http://searchenginewatch.com/2156221, (last visited October 29, 2009). Thus, the expectation created by the Salesperson that Yellowpages.com is a major online search engine is false.

40.    The Class Member is told if s/he purchases certain extra "Bells and Whistles," s/he will be assured of premium placement within Yellowpages.com. Such statements are false and misleading, as people conducting online searches often do not read beyond the first two pages of the search results, if any significant number of people in the Class Member's profession and geographic location buy the same "bells and whistles", the Class Member cannot be assured of – and almost certainly will not receive – premium placement on most searches.

41.    In the Scripted Presentation, the Class Member is told there are a limited number of Tile Positions for each profession in each geographic area and if his or her ad appears in one of the tile positions, the Class Member is assured of more traffic on his or her website. The Class Member is told that purchasing a tile position will ensure the Class Member is "one of the premiere [Class Members' business] in the [Class Members area]" and that such a purchase will ensure the Class Member a "top six" position.

42.    However, the Class Member often does not appear in a Tile Position, or in the top six positions despite the purchase of a Tile Position.

**The Guaranteed Clicks Program/Click To Call Program**

43.   Salespeople tell Class Members that by buying the YPClicks! Program, the Class Member is receiving "Clicks" from "locally targeted, qualified traffic to [the Class Member's] website." However, Clicks received by the Class Member are often neither local nor targeted. Thus, the representation of local and targeted traffic is false.

44.   The Salespeople omit to tell Class Members that a significant number of the Clicks (or phone calls in the Click to Call plan) will come from random and completely irrelevant sources and cannot reasonably be expected to result in business to the Class Member. Accordingly, the Class Member is mislead into believing that all Clicks or phone calls will come from relevant sources seeking the Class Members' products or services, but that is not the case.

45.   The Class Member learns, too late, that: whether it is Clicks or calls, s/he rarely, if ever, receives the amount of business upon which the salesperson had built their expectations based upon the Scripted Presentation and the ROI Analysis; the Clicks, searches and calls to the Class Member are frequently not relevant to the Class Member (and certainly much less relevant than represented by the Salesperson); and the majority of phone calls received by Class Members are people calling to request employment, people calling from outside of the service area of the Class Member, or people calling to sell services, supplies or products to the Class Member.

46.   Frequently, the Class Member's ad appears on sites where the placement makes the link to the Class Member's ad or webpage irrelevant or highly unlikely to generate business for the Class Member.

**The ROI Analysis Fraud**

47.     As part of the Scripted Presentation, the Class Member is asked, "If 10 people locally searching online for [Class Member's Business], how many do you think would do business with you." Sometimes the Salespeople will alter this question and ask "If 20 people. . . ." Based upon the Class Member's answer, the Salesperson will compute the estimated return stated by the Class Member on a percentage basis.

48.     The Salesperson then estimates the amount of new customers that the Class Member can expect to receive. This can be done in several ways:

i.  If the Class Member is considering the Guaranteed Clicks program, the Salesperson will multiply the average Clicks per month by the percentage the Class Member has estimated (e.g., if a Class Member says s/he can convert 1 out 10 Clicks to new customers, and the Class Member is looking to purchase a 1200 Clicks package –100 a month – the Salesperson will tell the Class Member s/he can expect 10 new customers a month (10% x 100 Clicks). The Salesperson then computes the number of new customers the Class Member can expect by the average revenue generated by the Class Member's average job and computes the additional revenue the Class Member will receive.

ii.  If the Class Member is considering the Click to Call package, the Salesperson will employ a similar analysis and estimate how many phone calls a month the Class Member will receive. This is computed by the Salesperson multiplying the number of searches purportedly generated by the Samurai system for the Class Member's product or service in the Class

Member's geographic area by the percentage of calls the Class Member estimates s/he could convert, the product being the number of new customers the Class Member will generate. The Salesperson then multiplies the number of new customers the Class Member purportedly can expect by the average revenue estimated per job and then tells the Class Member how much more money a month the Class Member will make.

iii. If a Class Member is not purchasing the YPClicks! Program or the Click to Call program and only wants to utilize the Search Engine Product, a different formula is used. In all events, however, the data utilized by the Salesperson from the Samurai System is not accurate and creates a false expectation of a return in the mind of the Class Member, because that data is retrieved from a number of internet search engines and not merely Yellowpages.com as represented. Thus, when a Salesperson represents that a Class Member can expect to receive a particular response to an advertisement in Yellowpages.com based upon the data from the Samurai system, that is a misrepresentation, since that system measures responses to a number of major search engines collectively and not merely to Yellowpages.com.

49.     Notwithstanding the methodology used to compute new customers by the Salespeople, the ROI Analysis is false and misleading for the following reasons, among others:

i. The statistical suppositions are based upon a false premises. For example, where the Class Member is asked, "If 10 people locally searching online for [Class Member's Business], how many do you think would do business with you" there is no answer that the Class Member can reasonably be expected

to give that will not end up giving the Class Member an unrealistically high expectation of business. This is because even if a Class Member responds that s/he could convert 1 out of 10 (a 10% conversion rate) – that number is already 10 times the national average. The national average for the "Click to conversion rate" for a website or ad is approximately 1%. Accordingly, unless the Class Member chooses a fraction of one—not one of the options given him or her—s/he is led to believe Defendant is going to increase business ten times what reasonably can be expected. Thus, the question is designed to create a false expectation on the part of the Class Member.

ii. Where a Class Member purchases only the Search Engine Product, s/he will have an unrealistic expectation of new customers as the Class Member is led to believe there are more searches for that Class Member's product or service in the Class Member's area than in fact there are because of the misrepresentation that the number of searches represented in the statistics given came from that area. The Class Member thus pays to be listed at the top of the search results, believing there are many more people searching that area for the Class Member's product than, in fact, there are.

50.     As a result, the Class Member is given an unrealistic expectation of the amount of business that the Class Member will receive by advertising with Yellowpages.com.

**The Terms and Conditions Are Not Reviewed by the Class Member Prior to Allegedly Assenting to the Contract**

51.     The Class Member is not provided with the Terms and Conditions that accompany the sales contract until after the Class Member hears the Scripted Presentation and signs an order form or orally agrees over the phone to purchase advertising services from Yellowpages.com (the "Alleged Assent").

52.     After the Class Member gives the Alleged Assent, Defendant sends two documents are sent to the Class Member: (i) the Contract For Internet Yellow Pages.com Advertising (the "Order"); and (ii) the Terms and Conditions For Internet Advertising. In some cases, the Class Member will actually sign the Order form in the presence of the Salesperson, but the Class Member is not presented with the Terms and Conditions of that Order at that time. While Defendant contends both documents form part of a binding contract, the Class Member is not able to review the Terms and Conditions until after s/he is tricked into entering into what Defendant asserts is a binding agreement.

53.     The Order is usually is presented to the Class Member in electronic format.  It contains items specific to the transaction such as the date, Salesperson, and the products ordered by the Class Member.

54.     In addition, the Order states:

> "This contract consists of and is governed by this Insertion Order pages [unreadable] hereto and in the Terms and Conditions for Internet Advertising, all of which are incorporated herein by reference.  By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING, (2) that they have the same force and effect as if given in full text on this document, and (3) that you acknowledge that Yellowpages.com's reliance upon your acceptance of them; however the version applicable to this contract shall be the latest dated version as of the date of your signature. You agree that you give authority to bind the individual or company purchasing this advertising in all respect to this contract and the incorporated terms and conditions."

(Emphasis added) – (the "Signature Required Clause").

55.     This clause is not shown to the Class Member before the Order is executed. If the Class Member has been solicited by a Telephone Sales representative the Class Member does not receive anything in writing until after s/he has recorded an Alleged Assent to what Yellowpages.com describes as the consummation of the transaction. If the sales presentation is

done by a Premise Salesperson, the Class Member signs a small screen (akin to what one signs for a UPS or FedEx delivery) or Clicks "OK" on the Salesperson's PDA. At no point does the Class Member have the ability to review the Terms and Conditions prior to giving what Defendant later asserts imposes as the Class Member's assent to the contract.

56.     The Order given to Kowalski is attached hereto is Exhibit "A."

57.     The Terms and Conditions, a copy of which is attached to Exhibit "B" contain the following material terms:

i.     The section entitled "Scope" (the "Scope Clause") states that as between the Terms and Conditions and the Order, the Order controls.

ii.     The Terms and Conditions contain material terms as to acceptance, automatic renewal, and termination:

> The term of the Agreement commences on the date of execution by the Plaintiff "(either in writing or by electronic signature including recorded oral acceptance of this Agreement of an Order presented by us and shall (subject to our right hereunder to terminate or suspend our performance or remove Advertising Products under circumstances specified in this Agreement) continue until we have fulfilled the Advertising Products specified in the Order for the initial Term specified in the Order. Unless otherwise provided in the Order and except as provided below in [unreadable] T&Cs, upon expiration of the Initial Term, <u>the term of this Agreement shall automatically renew for a "Renewal Term" unless you or we notify the other of its intent not to renew at least thirty days before expiration of the initial term</u> . . . [u]nless otherwise provided in the Order, either you or we may terminate the Renewal Term, with or without cause. . . [n]either of us may terminate this Agreement during the initial term [first year] . . . [i]f you choose to have our Advertising Products removed from any site and/or our services discontinued prior to the end of the initial Term or Renewal Term . . . you shall notify us in writing and the unpaid balance for the entire Initial Term or Renewal Term, as the case may be, will become immediately due and owing.

(Emphasis added).

iii. The Rates and Payments section contains material terms with respect to Yellowpages.com's ability to alter pricing, the billing cycle, the rates for

renewal, the right to collect attorneys' fees, and late fees. The clause also provides Yellowpages.com can bill a Class Member "for advertising products for which no rate is specified in the order" at the "standard rate" (although there is no statement of what a standard rate is and how it is computed);

iv. Unless the Class Member terminates the agreement at the end of the initial term, Yellowpages.com can renew it at its "standard rates" (although, again, the Terms and Conditions neither defines what a standard rate is nor provides any calculus upon which one determine that rate);

v. If payment is not received by the due date, Defendant can suspend all products being serviced on behalf of the Class Member;

vi. Defendant reserves to itself the right to charge late fees at a "standard rate" or the maximum rate permitted by law (again, no explanation is given of the standard rate);

vii. The Class Member is made responsible for any attorneys' fees and costs Defendant incurs in collecting any unpaid amounts;

viii. The section entitled "Custom Domain Registration/Ownership of Work Product" contains previously unrevealed material terms as to the ownership of the information within the Class Member's ad or website:

ix. Where the Class Member has ordered advertising products that include hosting or operation of a website – and where the Class Member does not already own the domain name that the website will host – Yellowpages.com will purchase the website on behalf of the Class Member or the Class

Member may transfer to the Yellowpages.com the domain name onto the Yellowpages.com's server.

x. Yellowpages.com may disable any hosted websites if payment is missed, and it will not release the domain name until the Class Member has paid all of Yellowpages.com bills;

xi. If Yellowpages.com purchases the domain name on behalf of the Class Member, Yellowpages.com, and not the Class Member is said to own the domain name (although in practice, even where Yellowpages.com does not purchase the domain name, Yellowpages.com has retained ownership of the domain);

xii. If the Class Member does not provide transfer instructions to Defendant upon the termination of the Agreement, Yellowpages.com retains the right to allow the domain name registration to lapse or allow Defendant to retain ownership; and

xiii. The Class Member is said to consent to the recording of all telephone conversations.

58.    The Order requires the Class Member provide a written signature before the Terms and Conditions take effect. The Order requires that payment in full be received prior to the fulfillment of the products listed therein.

59.    The Class Member does not learn the actual monetary consideration required by Defendant until the Class Member receives a fax purporting to state that a contract is already in place.

60.    The Class Member never receives a written statement explaining precisely where the ads will appear.

## The Conclusion of the Transaction

61.    Consistently throughout this experience, the Class Member will be given one set of expectations prior to the Alleged Assent to the Order, but learns, too late, that: (i) Defendant cannot and/or will not--and in fact does not--deliver upon the representations made by the Salesperson; and (ii) the Terms and Conditions received by the Class Member vary materially from what the Class Member was shown, told and expected.

62.    When the Class Member objects to paying for what s/he is not getting, s/he is turned over to the collections department which:

    i.   does not have the ability or authority to resolve the Class Member's complaint;

    ii.  does not have the authority to rescind contracts; and,

    iii. is instructed to tell Class Members that they must pay or their credit will be ruined.

63.    If payment is not made, the Class Member's account is sent to a law firm for further collection procedures. From start to finish the Class Member is deceived by fraudulent sales practices, is relegated to a contract governed by Terms and Conditions of which the Class Member had no knowledge; learns that the representations made were false and that the lack of customer service and technical support makes the very foundations upon the purported contract

stood misleading; has not received what was represented; and ultimately is turned over to an unrelenting collections department whose mantra is "destroy credit"; and finally, is sued.

## VI.  TRANSACTIONS OF THE NAME PLAINTIFFS

**Plaintiff Michelle Winick d/b/a Michelle Winick Design**

64.    Winick is an interior designer. In August of 2009, she was contacted by Craig De Vito ("De Vito"), a Yellowpages.com Premise Sales representative, who made an appointment to visit Winick in her studio.

65.    In accordance with the Scripted Presentation, De Vito, asked Winick, among other things, how she became involved in interior design, how long she had been involved in interior design, how many interior design jobs she performed in a week; what part of her business did she want to grow? How far did she travel to do interior design jobs; how much she wanted to grow her business over the next year.

66.    De Vito showed Winick a Samurai system spreadsheet which he represented showed the number of searches conducted by the general public on the Yellowpages.com website for interior designers.

67.    De Vito asked Winick, "If 10 people locally were searching online for an interior designer, how many do you think would do business with you." Winick estimated approximately 10%. Based upon the information generated through the Scripted Presentation, De Vito summed up Winick's "needs," and told her about the partnerships Yellowpages.com purportedly has with major search engines like Google, Yahoo, MSN, and the like. When Winick stressed that placement within these search engines was her highest priority, De Vito

assured her she would be featured prominently in online search results and the general public online searching for an interior designer in her area would be directed to her website.

68.    In accordance with the Scripted Presentation, De Vito assured Winick that because of Defendant's partnership with major search engines, Yellowpages.com could manage the Google and other major online internet search engine advertising and it actually would cost Winick less than if she advertised directly with Google or one of the other search engines. Winick was assured she would receive "strategic" advertising within the major search engines.

69.    Winick made it clear her interest was in the Search Engine Product. She was told that as part of the service, she would have an ad on Yellowpages.com which also would direct people to her website.

70.    She was told that Yellowpages.com would work with her to craft an ad on the Yellowpages.com website that would suit her needs and be attractive to the public.

71.    Based upon Defendant's representations, Winick signed an Order on De Vito's laptop. The Order that Winick signed did not contain any reference to the Terms and Conditions. It simply contained a spreadsheet containing information about her Order.

72.    Winick paid Defendant for the services for which she was billed.

73.    Winick learned her ad on Yellowpages.com did not contain the wording she wanted and she was told, too late, there was little, if any, customer service to help set up the ad in accordance with her specifications.

74.    When Winick searched for her business on the internet, she found it did not appear anywhere. Winick's calls of complaint to Defendant, often were not returned, and when they were the information provided was no more than a dodge Finally, De Vito told her "I am

sorry you got the impression that buying a listing on Yellowpages.com would ensure presence on the search engines."

75.     Previously Winick had been managing her own advertising campaign on the internet. When she began to utilize the services of Yellowpages.com, internet generated inquiries plummeted. Once Winick recommenced her own advertising internet generated inquiries returned to the pre-Yellowpages.com levels. Winick did not get what was represented to her or what she paid for.

**Plaintiff Al Kowalski d/b/a Kowalski Plumbing**

76.     Kowalski owns and operates a general plumbing business.

77.     On October 31, 2008, Kowalski contacted Defendant for the purpose of learning more about advertising on the internet with YellowPages.com. Plaintiff was directed to speak to a telephone sales representative, Royce Brown ("Brown"). Kowalski told Brown he would like to learn more about advertising opportunities with Yellowpages.com.

78.     In response Kowalski encountered a high pressure sales pitch. He was told he needed to advertise with Yellowpages.com immediately because the rates were going to be going up and he had to place his order for service immediately to get the current rates.

79.     Brown went through the Scripted Presentation with Kowalski asking about Kowalski's needs, how much each job was worth, etc. When Kowalski asked what the cost would be, in which areas on the internet his ads would appear, and how prominent his ads would be in certain search engines, he was assured he would receive prominent advertising in areas having to do with plumbing contractors, heating contractors and specialties, and water heaters (the "Appearance Categories").

80.     Kowalski asked exactly where these ads for the Appearance Categories could be found, but received little detailed information. Instead, Brown pushed Kowalski to lock in his advertising rate.

81.     When Kowalski asked Brown for the exact monthly cost Kowalski would incur for the website services and listing in the Appearance Categories, Brown answered he was unable to give the exact price but that it would appear in an agreement that would be sent to Kowalski.

82.     In reply, Kowalski stated he would wait to receive the agreement and then contact Yellowpages.com if he wanted to purchase services.

83.     Brown then stated he would need to record Kowalski's assent to the terms and conditions of their agreement to lock in the best rate and send the agreement to Kowalski.

84.     When Kowalski said he wanted to look at the agreement, Brown assured him this was procedural and Kowalski would have the ability to look at all of the terms of the deal.

85.     Ultimately, Kowalski agreed to a recorded conversation; however, after the recording was started and Brown stated Kowalski was agreeing to all of the terms and conditions they had discussed, Kowalski responded that he had not agreed to any terms or conditions.

86.     It appeared to Kowalski that Brown then ceased recording him, after which Brown stated the only way they could provide the documents with the information Kowalski was seeking was for Kowalski to agree to what Brown was setting forth. Brown assured Kowalski again that Kowalski would receive everything in writing and would be able to look it over after receiving it.

87.     It then appeared to Kowalski the recording was restarted, and Brown resumed his earlier questions. Brown stated that Kowalski would be receiving the agreement—presumably for review and approval--within twenty-four (24) hours.

88.     Brown never asked Kowalski for payment, and Kowalski believed the payment information would be contained in the documents Brown was sending.

89.     At approximately 1:35 p.m., on October 31, 2008, Kowalski received the Order and the Terms and Conditions. Plaintiff never signed the Order and never previously saw or discussed the Terms and Conditions.

90.     Kowalski never returned the Order or the Terms and Conditions.

91.     Further, the Terms and Conditions are in small print and not easily readable.

92.     On the following Monday, November 3, 2009, Kowalski informed Yellowpages.com he did not wish to pursue any relationship with it. He also made several calls and sent a fax to Brown stating the same information.

93.     When he spoke to Yellowpages.com, Kowalski was told he could not cancel his order as the contract was already in force and in effect with his verbal recorded consent.

94.     Shortly thereafter, and without Kowalski's permission, Yellowpages.com posted his advertising information online and sent his first month's bill on November 22, 2008, and a second bill on December 22, 2008, stating his account was past due. Kowalski's subsequent calls to Yellowpages.com have been ignored.

95.     Kowalski has been threatened by Defendant's representatives with adverse credit reporting, and Yellowpages.com has advised Kowalski it is going to commence a collection action against him.

**Statement Of Facts Of Michael R. Gidro, Esq.**

96.     Gidro is an attorney practicing in Teaneck, New Jersey.  He specializes in the area of bankruptcy law.

97.     On or about September 15, 2008, Gidro received a phone call from Yellowpages.com and eventually met with Cheryl D'Elia ("D'Elia") a sales representative of Yellowpages.com at Gidro's place of business to discuss an ad campaign.

98.     In accordance with the Scripted Presentation, D'Elia asked, among other things, within which industries and geographic areas that Mr. Gidro wanted to appear. Gidro replied that it was his objective to obtain clients seeking a bankruptcy attorney in Bergen County, New Jersey.

99.     D'Elia showed Gidro a Samurai system spreadsheet which D'Elia represented exhibited the number of searches conducted by the general public on the Yellowpages.com website for various categories of attorneys.

100.     D'Elia also represented that Defendant had partnerships with major online search engines and that by advertising on Yellowpages.com, Gidro also would appear on those major search engines as well.

101.     D'Elia also presented the YPClicks program to Gidro, stressing that Gidro would be receiving "local" and "targeted" traffic to his website.

102.     After the presentation, Gidro and D'Elia agreed on a budget that would be $467.00 per month.

103.     Gidro had signed up for the guaranteed Clicks program and was to receive, on average, 30 Clicks a month from local and targeted traffic. D'Elia stated that Yellowpages.com also would be responsible for designing, publishing and maintaining Gidro's website.

104.    After the website and Clicks program were up and running, Gidro contacted D'Elia and explained that he was not receiving the guaranteed thirty (30) Clicks a month, and was not experiencing the increase in business as had been represented by D'Elia during their meeting. In October 2008, Gidro spoke with D'Elia  and Gidro was assured that results would be forthcoming and that he needed to be patient.

105.    The situation did not improve. When Gidro continued to call he was continually transferred between D'Elia and other representatives of Defendant who recited a cacophony of excuses for why the Yellowpages.com ad campaign was not working as represented and suggested Gidro sign up for more services and spend more money with Defendant as a way to resolve the problem. Gidro stated he felt that everything had been misrepresented to him and he did not understand why he had to pay more money for something he had been told would work at the price upon which he had agreed.

106.    Surprisingly, Defendant also provided reports to Gidro that represented he was receiving the amount of Clicks required in his contract. The reports were not  true.  Gidro received no revenue as a result of advertising with Yellowpages.com.

107.    In an effort to investigate matters himself, Gidro did a search on Google, where he was told he would appear, typing "Bankruptcy Attorney Bergen County," the designation he had told D'Elia he wanted; he did not find himself listed  in the search results.

108.    Defendant also provided Gidro a document referred to as a scoreboard report, which delineates, on a monthly basis, the number of Clicks (or, if the Class Member has purchased a guaranteed call program the number of phone calls) a Class Member has received.

109.    D'Elia represented and Defendant contracted that Gidro would receive, on average, thirty (30) clicks a month. Gidro's scoreboard report showed that he only received:

    i.   5 Clicks for the month of September 2008;

    ii.  10 Clicks for the month of October 2008;

    iii.  2 Clicks for the month of December 2008;

    iv.  10 Clicks for the month of January 2009.

110.    On February 7, 2009, Gidro received a different report from Defendant that showed that a portion of the Clicks Gidro had received came from links within searches that were completely unrelated to what Gidro had requested. The data showed that consumers had been sent to Gidro's site by Clicking on "criminal defense" or "criminal law" links. Therefore, even the Clicks that Gidro received were not targeted as he had requested and were useless to him.

111.    Eventually, Gidro learned that while he appeared in a Yellowpages.com search, he could not be found in searches on any major search engine. If Gidro had known that he would only appear on Yellowpages.com, he would not have bought the service. Indeed, this was contrary to Defendant's scripted representation that Yellowpages.com had "partnerships" that would allow Gidro's ad to appear in prominent positions in major internet searches.

112.    Despite paying Defendant's bills, Gidro never received the requisite amount of phone calls pursuant to the contract.

113.    Gidro tried to terminate the contract at numerous occasions prior to the contract's stated termination date. Upon the termination date, Gidro tried to cancel his service with Yellowpages.com again, despite the fact that the contract had ended, Yellowpages.com has continued to charge Gidro's credit card.

## VII.   CLASS ACTION ALLEGATIONS

114.   Plaintiffs bring this action on behalf of a class (the "Class") consisting of all persons or entities in the State of New Jersey that allegedly contracted with Yellowpages.com for advertising services from and after May 1, 2005.  Excluded from the Class are Defendant, and any person and any entity which controls or is controlled by or is under common control with Defendant.

115.   Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(2) for injunctive and equitable relief and (b)(3) for damages.

116.   The Class is composed of thousands of persons dispersed throughout the State of New Jersey, the joinder of whom in one action is impracticable, and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

117.   The Class is ascertainable, is cohesive and maintains a sufficient community of interest, since the rights of each member of the Class were violated in a similar fashion based upon, among other things, Defendants' use of a uniform script and presentation and misrepresentations and omissions common to all Class members. Further, the equitable relief sought will be common to the Class.

118.   The victimized consumers can be identified in the databases maintained by Defendant.  More specifically, Defendant maintains databases that would contain the following information: (1) the name of each consumer "enrolled" in a Yellowpages.com advertising program via a written contract or order; and (2) the address of each such individual.

119.   Thus the Class Members can be located and notified with specificity of the pendency of this action using techniques and a form of notice customarily used in class action litigation.

120.    Plaintiffs will fairly and adequately protect the members of the Class as plaintiffs have retained competent counsel who are experienced in federal and state class action claims such as those asserted in this case.

121.    A class action is superior to all other methods for the just, fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, the damages suffered by individual Class Members are not sufficient to justify the enormous cost associated with the prosecution of this type of litigation.  The expense and burden posed by such individual litigation makes it impossible for the Class members to individually redress the wrong done to them; neither would such an individual case be adequate to ensure that such practices cease to harm others.  There will be no difficulty in the management of this action as a class action.

122.    Common questions of law and fact exist as to all members of the Class and these common issues predominate over any questions which go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

i.    whether there is a valid contract between Defendant and the Class Members where the Order and/or Terms and Conditions are not provided to the Class Members until after they purportedly have given their assent to the Order;

ii.   if a contract exists, whether Defendant's contract constitutes a breach of that contract;

iii.  whether the Script and Scripted Presentation contain material misrepresentations or omissions;

iv.   whether Yellowpages.com has a right to collect these alleged debts of the Class Members;

      v.  whether Yellowpages.com has a strategic partnership with major search engines that enables Yellowpages.com to employ strategic advertising as represented in the Scripted Presentation;

     vi.  whether Yellowpages.com actually performs the technical functions as represented by the it and whether the functions performed are in accordance with the industry standards;

    vii. whether Defendant's conduct constitutes an unconscionable commercial practice; and

   viii.  whether Defendant's conduct violates the New Jersey Consumer Fraud Act.

123.    The Common questions predominate over any questions which may affect individual members of the Class.

124.    In addition, Yellowpages.com has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I – VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT,
## N.J. STAT. ANN. 56:8-1 ET. SEQ. ("NJCFA")

125.    All of the allegations of the previous paragraphs are incorporated herein.

126.    The conduct of Defendant as aforesaid constitutes unconscionable commercial practices as defined in the NJCFA in connection with Defendant's solicitation and performance of its agreements with the Class Members. The unconscionable commercial practices include, but are not limited to the use of deception, false promise, misrepresentations, and the knowing suppression and concealment of material facts with the intent that the Class Members rely upon such concealment.

127.    Without limiting what has been stated previously, Defendant has made misrepresentations and or omitted material facts including the following: (i) Defendant has misrepresented that is has entered into partnerships with major on-line search engines which will result in advertisements placed by Class Members receiving premium placement on those sites and/or will render it less expensive for Class Members to advertise on those search engines through Defendant than by doing so directly; (ii) Defendant has misrepresented that Yellowpages.com is a major search engine; (iii) Defendant has misrepresented that the purchase of a Tile Position will assure the Class Member his/her advertisement will be featured at or near the top of the list of results when a consumer conducts an internet search; (iv) Defendant has misrepresented that it can and will arrange the Class Members' advertising and websites in such a way and provide such exposure so as to assure that Clicks on the website will come from potential customers in a relevant geographic area; (v) Defendant's representation as to searches on the Yellowpages.com website is materially overstated since the data used to support that represents searches not only on Yellowpages.com, but on other major search engines as well; (vi) Defendant phrases questions to Class Members in such a way as to yield  materially misleading results and uses those materially misleading results to support

unjustifiable and incorrect expectations on the part of the Class Members; (vii) Defendant has omitted to state it lacks the technology or customer support to have a reasonable basis to assert that the Class Member's website will appear in visible, relevant, local, and targeted searches and be displayed prominently therein; and, (viii) Defendant requires the Class Member execute Orders when Defendant knows the Orders, even if read, omit the material information contained in the Terms and Conditions.

128.     Defendant's unconscionable commercial practices include, in addition to the misrepresentations and omissions: (i) purportedly entering into agreements with Class Members which omit material terms, thereafter adding those material terms in the form of Terms and Conditions, declaring to the Class Members they are bound by those terms, and taking action to enforce the purported agreements;  and (ii) refusing to permit rescission when Defendant knows the Class member has entered into the contract based upon misrepresentation and omissions and/or that Defendant has failed to or is incapable of performing under the agreement; and, (iii) using presentations which Defendant knows contain unsubstantiated assumptions and asking the Class Members to make projections based on those assumptions.

129.     The Class Members have suffered an ascertainable loss as a proximate result of violations of the NJCFA in the following manners, among others: Class Members have been induced and/or coerced into paying for advertising services which (i) was procured through fraudulent means and/ or (ii) they are alleged to have ordered though those orders were procured through fraudulent means; and/(b) those who have not paid for the service are threatened with or have suffered adverse credit reporting, collection actions and legal actions.

## COUNT II
## BREACH OF CONTRACT

130.    All of the allegations of the previous paragraphs are incorporated herein.

131.    If the Court finds a contract was formed, Defendant has breached the Contract by failing to provide the services and revenues represented in the Scripted Presentation; and failing to perform the requisite customer and technical service required for the fulfillment of the representations made by Defendant; and, failing to perform in good faith and in a fair manner in the facilitation of the Class Member's contract

132.    The Class Members have been damaged as a proximate result of Defendant's breaches of contract

### III.    PRAYER FOR RELIEF

Wherefore, plaintiffs demand judgment against Defendant on behalf of themselves and the Class as follows:

I.    An order certifying that this action may be maintained as a class action;

II.    Compensatory damages in an amount to be proven at trial;

III.    Equitable and injunctive relief as permitted by law or equity, including the rescission of all contracts that fall within the purview of the Class Member's complaint

IV.    Equitable relief in the form of an injunction preventing Yellowpages.com deceptive practice to continue into the future;

V.    Awarding the Class Members treble the amount of their damages pursuant to N.J.Stat.Ann. 56:8-19;

VI.    Awarding the Class Members reasonable counsel fees, filing fees, cost of investigation, and costs of this lawsuit, pursuant to N.J.Stat.Ann. 56:8-19;

VII.    Pre and post-judgment interest; and

VIII.    Such other and further relief as the court may deem necessary or appropriate.

## IV.    DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Date:   November 6, 2009
      Paramus, New Jersey

By:   **s/Paul I. Perkins**
    Paul I. Perkins, Esq.
    **LYNCH LAW FIRM, P.C.**
    45 Eisenhower Drive
    Paramus, NJ  07652
    (800) 656-9529
    (888) 271-9726 (fax)
    paulperkins@lynchlawyers.com

Date:   November 6, 2009
      Saddle Brook, New Jersey

By:   **s/Peter S. Pearlman**
    Peter S. Pearlman, Esq.
    **COHN LIFLAND PEARLMAN**
    **HERRMANN & KNOPF LLP**
    Park 80 Plaza West – One
    Saddle Brook, NJ 07663
    (201) 845-9600
    (201) 845-9423 (fax)
    psp@njlawfirm.com